**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ONH AFC CS INVESTORS, LLC, *et al.*,[1]<br><br>    Debtors. | Confirmed Chapter 11 (Subchapter V)<br><br>Case No. 23-10931 (CTG)<br><br>(Jointly Administered) |
| ANNA PHILLIPS, in her capacity as the<br>Liquidating Trustee of the ONH Liquidating Trust,<br><br>    Plaintiff,<br><br>        v.<br><br>AKERMAN LLP,<br><br>    Defendant. | Adv. Proc. No. 25-_____ (CTG) |

**COMPLAINT TO AVOID AND RECOVER TRANSFERS**
**UNDER 11 U.S.C. §§ 544, 548 AND 550, APPLICABLE**
**STATE LAW AND OTHER RELATED OR ALTERNATIVE RELIEF**

Anna Phillips, in her capacity as the Liquidating Trustee of the ONH Liquidating Trust (the

"Trustee"), commences this adversary proceeding against Akerman LLP (the "Defendant"), for

the relief requested below, based upon the following set of facts:

**NATURE OF THE PROCEEDING**

1.    The Trustee seeks entry of a judgment against the Defendant: (i) avoiding the

Fraudulent Transfers (as defined below) pursuant to sections 544(b) and 548(a) of the Bankruptcy

Code and applicable state law, and related subsequent transfers under section 550 of the

Bankruptcy Code and applicable state law; and (ii) directing the Defendant and/or any other party

---

[1]    The last four digits of the Debtors' federal tax identification numbers are 1199 (ONH AFC CS CS Investors LLC) and 6326 (ONH 1601 CS Investors LLC). The Debtors' mailing address is 3445 Peachtree Road, Suite 1225 Atlanta, GA 30326.

determined to be an initial, subsequent or mediate transferee, or party for whose benefit the avoided transfers were made, to pay the Trustee in an amount to be determined that is not less than the amount of the Fraudulent Transfers, plus interest and costs, pursuant to section 550(a) of the Bankruptcy Code and applicable state law.

## JURISDICTION AND VENUE

2.     This adversary proceeding relates to the Chapter 11 cases of ONH AFC CS Investors, LLC ("ONH AFC CS") and ONH 1601 CS Investors, LLC ("ONH 1601 CS" and together with ONH AFC CS, the "Debtors"), which are pending in the United States Bankruptcy Court for the District of Delaware (the "Court") and are being jointly administered under Case No. 23-10931 (together, the "Bankruptcy Cases").

3.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b).

4.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O).

5.     Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6.     The Trustee consents to entry of final orders and judgments by the Court in this adversary proceeding, regardless of whether it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PROCEDURAL BACKGROUND

7.      On July 14, 2023, (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code and elected to proceed under Subchapter V of the Bankruptcy Code (Dkt. No. 1 in the Bankruptcy Cases).

8.      Additional factual background relating to the Debtors' businesses and the commencement of the Bankruptcy Cases is set forth in detail in the *Declaration of Eric Lee in Support of Chapter 11 Petitions and First Day Motions* (Dkt. No. 2 in the Bankruptcy Cases), which is incorporated herein. Factual background more specific to this complaint is set forth below.

9.      This adversary proceeding is part of the Trustee's continuing obligation to recover assets for the benefit of the Debtors' respective bankruptcy estates.

## PARTIES

10.     The Debtors were Delaware limited liability companies and had pre-petition principal places of business at 1430 Broadway, Suite 1605, New York, New York 10018.

11.     Anna Phillips is the Liquidating Trustee of the ONH Liquidating Trust ("Trust").

12.     The Trust is the successor in interest to the Debtors' claims and causes of action under the *Amended Small Business Debtors' Plan of Liquidation* (Dkt. No. 202-1 in the Bankruptcy Cases) (the "Plan") confirmed by the Bankruptcy Court by an order entered December 14, 2023 (Dkt. No. 214 in the Bankruptcy Cases) (the "Confirmation Order"). Pursuant to the Plan, the Trust is the successor in interest to the Debtors' claims and causes of action, including the claims asserted herein. Under the Plan and Confirmation Order, certain investors assigned to the Trust their claims and causes of action related to the Debtors.

13.     Upon information and belief, Defendant resides, or has a principal place of business, at 1251 Avenue of the Americas, New York, NY 10020.

## FACTUAL BACKGROUND RELATED
## TO THE DEBTORS AND BANKRUPTCY CASES

14.     The Debtors were formed to raise equity from third parties by representing that the money was for the purposes of investing in property holding companies that would own commercial real estate in Atlanta, Georgia and Miami Beach, Florida.

15.     The Debtors' limited liability company agreements (the "AFC Operating Agreement" and "1601 Operating Agreement," collectively the "Operating Agreements") provided for the governance of the Debtors' affairs, the conduct of the Debtors' businesses, and the relations among the Debtors' members.

16.     Mr. Elchonon (also known as "Elie") Schwartz ("Mr. Schwartz") formed the Debtors in 2022.  Before that, Mr. Schwartz formed and operated several companies (collectively, the "Nightingale Group") that invested in commercial real estate and were organized under either One Night Holdings LLC ("One Night Holdings") or The Nightingale Group, LLC (collectively, with One Night Holdings and their affiliates, "Nightingale").

17.     Debtor, ONH AFC CS was created to raise equity from investors to fund, in part, the purchase of the Atlanta Financial Center, a large commercial real estate complex in Atlanta, Georgia, located at 3333 Peachtree Road NE, 3343 Peachtree Road NE, and 3353 Peachtree Road NE (the "Atlanta Financial Center").  Based on documents provided to investors, Mr. Schwartz stated that he intended that ONH AFC CS would enter a series of transactions that, together with other entities, would establish a capital structure for an anticipated transaction involving the purchase of the Atlanta Financial Center.[2]  Mr. Schwartz stated that these transactions were to occur

---

[2]     The anticipated capital structure provided to investors will be explained in greater detail below.

when all of the capital providers and entities raised their portion of capital for the overall transaction.

18.     A few months after ONH AFC CS was created, Debtor, ONH 1601 CS was created to raise equity from investors to purchase equity interests in and recapitalize the entity that owned a mixed-use building in Miami Beach, Florida, located at 1601 Washington Ave, 1605 Washington Ave, and 1619 Washington Ave ("Lincoln Place"). While Lincoln Place had already been majority owned and controlled by the Nightingale Group, based on documents provided to investors, Mr. Schwartz intended that ONH 1601 CS would enter a series of transactions that, together with other entities, would establish a capital structure for an anticipated transaction involving the recapitalization of Lincoln Place.[3] Mr. Schwartz stated that these transactions were to occur when all of the capital providers and entities raised their portion of capital for the overall transaction.

19.     Mr. Schwartz, through the Debtors and other affiliates, informed potential investors that ONH AFC LLC ("ONH Prop. Co."), or a similarly named legal entity, planned to purchase and renovate the Atlanta Financial Center and provide a large investment to renovate Lincoln Place using money raised from the following sources:  (1) equity from investors whom the Debtors solicited through an online registered broker-dealer, CrowdStreet, Inc. ("CrowdStreet"); (2) equity from other investors; (3) equity from Nightingale entities; and (4) senior secured indebtedness.

20.     At the time of the Offerings (defined below), the manager of each of the Debtors was One Night Holdings.

21.     Upon information and belief, One Night Holdings' manager was Mr. Schwartz.

---

[3]     The anticipated capital structure provided to investors will be explained in greater detail below.

22.     The Debtors planned to raise funds from accredited investors solicited using the CrowdStreet investor platform, which qualified as a private placement under Regulation D of the Securities Act of 1933.

**A.  <u>The CrowdStreet Platform Arrangement</u>**

23.     To begin raising equity for the Offerings (defined below), a Nightingale entity signed a marketplace services agreement with CrowdStreet (the "<u>MSA</u>") to access its community of accredited investors who invest using CrowdStreet's services.

24.     Pursuant to the MSA, Nightingale entities would then execute additional term sheets related to specific project offerings—such as for the Atlanta Financial Center and Lincoln Place (the "<u>CrowdStreet Term Sheets</u>").

25.     The CrowdStreet Term Sheets for the Atlanta Financial Center and Lincoln Place referred to the project offerings as "Specific Project Offerings," which limited the use of proceeds to only certain pre-identified and selected properties which were readily identifiable. CrowdStreet Term Sheets, n. 1.

26.     The MSA required that all funds raised from investors be held in a segregated account until the closing of the Atlanta Financial Center and Lincoln Place projects. Section 5.3 of the MSA provides:

> [Nightingale] agree[s] to establish a separate bank account or escrow account for each Project Offering and to provide funding instructions to investors through the Management Console. [Nightingale] shall deposit all User contributions, funds, or subscriptions into the bank account or escrow account you establish and hold it or have it held in trust until the closing of each Project Offering. If a Project Offering fails to close for any reason, [Nightingale] agree[s] to return investor contributions in full and promptly but no later than thirty (30) calendar days following failure of the Project Offering to close.

MSA, § 5.3.

**B.  The Subscription Process for ONH AFC CS and ONH 1601 CS**

27.     Nightingale proceeded to obtain third-party funds through offerings for ONH AFC CS (the "AFC Offering") and ONH 1601 CS (the "1601 Offering," together with the AFC Offering, the "Offerings") placed on CrowdStreet's website called the CrowdStreet Marketplace.

28.     Upon information and belief, on or about April 25, 2022, Mr. Schwartz caused ONH AFC CS to be formed in Delaware.

29.     Upon information and belief, on or about July 15, 2022, Mr. Schwartz caused ONH 1601 CS to be formed in Delaware.

30.     Nightingale launched the Offerings on the CrowdStreet Marketplace on or about May 26, 2022, and November 1, 2022, respectively.

31.     Accredited investors could then review Offering materials, learn more about the Atlanta Financial Center and Lincoln Place proposed transactions, and complete their investment documents through the CrowdStreet Marketplace.

32.     The CrowdStreet Marketplace website provided potential investors with a list of permitted uses for the funds provided by subscribers to the Offerings. The permitted uses were limited to using funds for the purchase price of the Atlanta Financial Center and Lincoln Place, closing costs, TI/LC (tenant improvement and leasing commissions), Capex, the interest reserve, financing costs, acquisition fee and CrowdStreet deployment fee.

33.     The CrowdStreet Marketplace website did not inform potential investors that funds would be used for Mr. Schwartz's personal debts and expenses.

34.     In connection with the Offerings, the private placement memoranda for both projects (the "Lincoln Place PPM," or "Atlanta Financial Center PPM," and together, the "PPMs")

7

was provided to prospective investors, including those who ultimately transferred funds to the Debtors.

35.    The PPMs outlined the terms of the purported investment.

36.    The PPMs informed investors that Mr. Schwartz was the contact person for the Debtors and directed investors to direct inquiries to him. PPMs, pp. 2-3.

37.    The Debtors represented to prospective investors that One Night Holdings and/or its affiliates were making capital contributions of no less than ten percent (10%) of the investment capital the Debtors were seeking. PPMs, p. 7.

38.    Contrary to the representations made to investors, neither One Night Holdings nor its affiliates made the promised capital contribution.

39.    The PPMs conditioned the use of the funds raised only upon closing on the purchase of the Atlanta Financial Center and Lincoln Place properties.

40.    Specifically, the PPMs stated: "The proceeds from this Offering will be used to purchase, lease, reposition, and extensively renovate [the properties]." PPMs, p. 8.

41.    The PPMs each also stated that: "If the Manager elects not to close on the Property for any reason" by September 11, 2022, for the Atlanta Financial Center and by December 31, 2022, for Lincoln Place, "subscription funds from potential Investors will be returned." PPMs, p. 8.

42.    The Debtors also informed potential investors that One Night Holdings would return investor funds in excess of the amounts One Night Holdings determined were "reasonably necessary to complete the" purchase of the Atlanta Financial Center or close on the loan. PPMs, p. 32.

43.     These representations were designed to induce prospective investors, including those who ultimately transferred funds to the Debtors (collectively, the "Creditors"), to participate in the Offerings.  The Debtors, controlled by Mr. Schwartz, knew these representations were false when they were made.

44.     Accredited investors who opted to invest in response to the Offerings were required to execute subscription agreements (the "Lincoln Place Subscription Agreement" or "Atlanta Financial Center Subscription Agreement" and collectively, the "Subscription Agreements") governing their investments: (i) in the case of ONH AFC CS, to fund the purchase, leasing, reposition, and renovation of the Atlanta Financial Center; and (ii) in the case of ONH 1601 CS, to fund the recapitalization and renovation of Lincoln Place.

45.     Furthermore, the Subscription Agreements each provided: "The Company will use any proceeds from this Offering, net of any organizational and offering expenses, to fund through its direct or indirect subsidiaries" Atlanta Financial Center or Lincoln Place, each of which were "Managed by One Night Holdings LLC."  Subscription Agreements, p. 1.

46.     The Subscription Agreements, PPMs, and MSA each made clear that investors' subscription money would only be used on or after the closing of the purchase of the Atlanta Financial Center or Lincoln Place and, if not so utilized, returned to investors. PPM p. 8 ("If the Manager elects not to close on [Atlanta Financial Center or Lincoln Place] for any reason by [September 11, 2022, or December 31, 2022], subscription funds from potential Investors will be returned.").

47.     The Subscription Agreements provided that investments of capital would be deposited into ONH AFC CS and ONH 1601 CS bank accounts, each of which was controlled by Mr. Schwartz on behalf of the Debtors.

9

48.     In addition to the PPMs and Subscription Agreements, potential investors in the Offerings were also provided access to the Operating Agreements.

49.     Creditors who executed the Subscription Agreements expressly acknowledged that they reviewed the Operating Agreements. Subscription Agreements, p. 6.

50.     The Operating Agreements, which were provided to potential investors as an attachment to the PPMs, informed potential investors that One Night Holdings would be diligent in its "efforts to promote and protect the interests of the Company … [and that t]he Manager shall act in the best economic interests of the Company and the Property, shall engage in only arm's-length transactions (even with Affiliates), will comply with all of its fiduciary duties to the Company…" Operating Agreements, section 7.3.

51.     The Operating Agreements each required that the Debtors only use the funds for their own "benefit" and not for the benefit of others. Specifically, Section 12.3 of the Operating Agreements provided: "[t]he Manager shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, whether or not in their immediate possession or control. The Company's funds shall not be commingled with the funds of any other Person and the Manager shall not use, or permit use of, the Company's funds in any manner except for the benefit of the Company."

52.     References to the Operating Agreements are incorporated throughout the PPMs and Subscription Agreements.

53.     The Debtors, through Mr. Schwartz, made material misrepresentations in the PPMs, Subscription Agreements and Operating Agreements. As detailed below, Mr. Schwartz and each of the Debtors knew at the time they made the representations regarding the segregation and

restrictions on use of funds that the Debtors and Mr. Schwartz would co-mingle and misappropriate the Creditors' funds.

54.     The Debtors also represented that One Night Holdings and/or its affiliates would make a capital contribution to each of the Debtors.  The Debtors, through Mr. Schwartz, knew that the representation regarding the capital contribution from One Night Holdings and/or its affiliates was false when it was made because the Debtors knew from the beginning of the Offerings that they would be transferring funds to other Schwartz controlled entities, not receiving funds in the form of a capital contribution from them.

55.     For instance, on June 10, 2022, ONH AFC CS transferred $1.2 million to One Night Holdings. Based upon the Trustee's professionals' review of the Debtors' books and records, the transfer was unconnected to any purpose related to ONH AFC CS and did not provide any benefit to ONH AFC CS. Instead, that same day, One Night Holdings transferred $1.2 million to Mr. Schwartz's personal account.

56.     The Debtors breached the terms of the Subscription Agreements and Operating Agreements when they used the Creditors' funds for impermissible purposes.

57.     ONH AFC CS raised approximately $44 million (net of refunds) through the AFC Offering from 654 investors for the Atlanta Financial Center project.  All funds that ONH AFC CS received from investors were commingled in the ONH AFC CS bank account under the control of Mr. Schwartz.

58.     ONH 1601 CS raised approximately $8.8 million (net of refunds) through the 1601 Offering from 167 investors for the Lincoln Place project.  All funds that ONH 1601 CS received from investors were commingled in the ONH 1601 CS bank account under the control of Mr. Schwartz.

11

**C. The AFC and Lincoln Place Proposed Transactions**

59.     The concept for the deal structure proposed by Mr. Schwartz for acquisition of the Atlanta Financial Center provided that ONH AFC CS LLC, a Delaware limited liability company, would acquire the properties from the seller. Atlanta Financial Center PPM, p. 7.

60.     On May 3, 2022, ONH Prop. Co. entered into a purchase agreement with USPO Atlanta LLC for the acquisition of the Atlanta Financial Center (the "AFC Sale Contract").

61.     Upon information and belief, Mr. Schwartz represented that ONH Prop. Co. would arrange senior secured debt financing in connection with that purchase. Atlanta Financial Center PPM, p. 8.

62.     Upon information and belief, upon the closing of the AFC Sale Contract, Mr. Schwartz stated that he intended that ONH AFC CS would enter into certain transactions and use the solicited funds to acquire an interest as one of two members of an entity called ONH AFC CS Mezz, LLC, a Delaware limited liability company ("AFC Mezz"), and AFC Mezz would acquire the interest in ONH Prop. Co. Atlanta Financial Center. PPM, pp. 7-8.

63.     But, at no time did ONH AFC CS execute any contract that contained, or otherwise obtain, a legal right to any interest in any property (including the Atlanta Financial Center or Lincoln Place).

64.     And, at no time did ONH AFC CS acquire any of the membership interests (or right to them) as provided in the equity raise documents or contemplated deal structure.

65.     Upon information and belief, the deal structure proposed by Mr. Schwartz for investing in Lincoln Place provided that, upon closing of a purchase transaction, the equity raised by ONH 1601 CS would be used to purchase equity in ONH 1601 Mezz LLC. Lincoln Place PPM, p. 7.

12

66.     Upon information and belief, upon closing, Mr. Schwartz represented that ONH 1601 Mezz LLC would then have two members—ONH 1601 CS and ONH 1601 Investors LLC. Lincoln Place PPM, p. 7.

67.     But, at no time did ONH 1601 CS execute any contract that contained, or otherwise obtain, a legal right to any interest in any property (including Lincoln Place or the Atlanta Financial Center).

68.     And, at no time did ONH 1601 CS acquire any of the membership interests (or right to them) as provided in the equity raise documents or contemplated deal structure.

69.     From the start of the subscription process until just before the Bankruptcy Cases, Nightingale Group published notes to investors through CrowdStreet Marketplace providing updates on both projects, including issues and difficulties encountered in closing the projects.

70.     Despite never executing contracts for the purchase of assets, and despite the purchase of the projects never closing, the Debtors caused the Fraudulent Transfers to be made from the funds deposited by the Creditors.

71.     After several communications to investors regarding the status of the projects, on May 31, 2023, investors received an update from CrowdStreet detailing further developments on the Atlanta Financial Center and Lincoln Place, and requesting investor action to appoint a new, independent manager for ONH AFC CS and ONH 1601 CS.

72.     Upon information and belief, the Debtors and Mr. Schwartz made untrue statements of fact and/or omitted statements of materials fact to investors in connection with the Offerings, including, without limitation, facts concerning Nightingale's financial wherewithal, Mr. Schwartz's intended use of the funds from the Offerings, and his assignment of the AFC Sale Contract to a third party to finance the downpayment, among many other things.

13

73.     Upon information and belief, Mr. Schwartz and the Debtors made multiple misstatements and/or omitted statements of material fact in order to fraudulently induce the Creditors to invest in the Debtors.

74.     Upon information and belief, the Creditors relied on the Debtors' material misstatements in deciding to enter into Subscription Agreements and transfer funds to the Debtors.

75.     Upon information and belief, the Debtors' material misstatements constituted a violation of securities laws, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

76.     The Debtors violated the terms of the Subscription Agreements and Operating Agreements by using the Creditors' funds for impermissible purposes, including but not limited to, using funds to pay for Mr. Scwartz's personal obligations, jewelry, and a residence for Mr. Schwartz's personal use.

### D.  Independent Manager

77.     Ms. Anna Phillips was appointed by an overwhelming majority of the Creditors as independent manager of the Debtors, effective June 7, 2023 (in this capacity, the "Independent Manager").  At the same time, Mr. Schwartz (as manager of One Night Holdings) resigned as manager of the Debtors.

78.     Ms. Phillips immediately began her investigation into the location and use of the Debtors' assets and funds raised through the CrowdStreet Marketplace.

79.     Ms. Phillips learned that almost all of the Debtors' funds had been withdrawn from bank accounts in the Debtors' names and dissipated prior to her appointment as Independent Manager.

80.     Several weeks later, on July 14, 2023, the Debtors filed the Bankruptcy Cases.

81.     After the appointment of the Independent Manager and during the Bankruptcy Cases, the Debtors investigated how the Debtors' funds dissipated, conducted diligence, and negotiated settlements and other resolutions with Mr. Schwartz, other entities held closely by Mr. Schwartz, and the Nightingale Group.

82.     Through the Bankruptcy Cases, the Debtors confirmed the Plan, and the Liquidating Trust was formed to pursue claims and causes of action on behalf of the Debtors.

83.     On October 12, 2023, the Independent Manager filed a Notice of Settlement attaching a Settlement and Conditional Release Agreement documenting the terms of a settlement reached between the Debtors, Mr. Schwartz, and entities and trusts related to Mr. Schwartz, including, but not limited to, Nightingale (Dkt. No. 148 in the Bankruptcy Cases) (the "Schwartz Nightingale Settlement").  Among the claims settled in the Schwartz Nightingale Settlement were the Debtor's potential claims against Mr. Schwartz and Nightingale "under section 544 of the Bankruptcy Code or otherwise."

84.     On May 7, 2024, following numerous breaches of the Schwartz Nightingale Settlement, the Court entered final judgments against Mr. Schwartz and Nightingale in favor of the Trustee on behalf of the Debtors (Dkt. No. 271 in the Bankruptcy Cases).

### E.  Mr. Schwartz Pleads Guilty and Admits to Defrauding Creditors

85.     On December 4, 2024, the United States Attorney for the Northern District of Georgia and the United States Department of Justice (the "Government") filed a Criminal Information against Mr. Schwartz due to his conduct in connection with the Offerings in the United States District Court for the Northern District of Georgia, which was assigned case number 1:24-cr-00371-SDG (the "Criminal Case").

15

86.     The Government alleged in part that Mr. Schwartz knowingly and intentionally

devised:

> a scheme and artifice to defraud investors using CrowdStreet Marketplace, and to obtain
> money and property from those victims by means of materially false and fraudulent
> pretenses, representations, and promises, and by omission of material facts, well knowing
> and having reason to know that said pretenses, representations, and promises were and
> would be false and fraudulent when made and caused to be made and that said omissions
> were and would be material.

87.     The Government also alleged that "[c]ontrary to the representations made to

CrowdStreet investors regarding the restrictions on the use of investor funds, and before either the

Atlanta Financial Center or Lincoln Place transaction closed, defendant SCHWARTZ

misappropriated and converted CrowdStreet investor funds for his own use."

88.     As set forth in the Criminal Information, Mr. Schwartz stole funds he promised

would be restricted to the Debtors' projects to buy luxury watches, purchase stocks and options

for his personal ownership, and cover expenses for his other, non-Debtor business ventures.

[Criminal Case, Dkt. No. 1, pp. 4-5].

89.     On February 12, 2025, Mr. Schwartz pled guilty to wire fraud. In the Guilty Plea

and Plea Agreement, Mr. Schwartz admitted that he made representations to creditors that he

would limit the use of funds raised "to purchase, lease, reposition, and extensively renovate" the

Debtors' projects, "use any proceeds from [the Offerings] net of any organizational and offering

expenses, to fund the investment…" in the Debtors' projects, and that Mr. Schwartz "had a

fiduciary duty to safeguard the funds and prohibit commingling or use of the money that did not

benefit [the Debtors]…" [Criminal Case, Dkt. No. 13].

90.     Mr. Schwartz also admitted in his guilty plea that "[n]otwithstanding [his]

representations and restrictions on the use of funds, and before either transaction closed, [he]

misappropriated and converted the funds raised through CrowdStreet." [Criminal Case, Dkt. No. 19, p. 8].

91.     Mr. Schwartz admitted to making representations to the Creditors that he knew were false when he made them.

92.     Mr. Schwartz was acting as the Debtors' representative when he made statements regarding the restrictions on the uses of funds, capital contribution from One Night Holdings and/or its affiliates, when the Debtors raised and received funds and when he committed the fraudulent acts to which he pled guilty.

93.     Through his counsel, Mr. Schwartz admitted in his Defense Sentencing Memo that investors on the CrowdStreet platform relied on CrowdStreet's requirement that investor funds remain untouched until the closing of deals "to protect their money and prevent exactly the kind of catastrophic losses which occurred…" because of Schwartz. [Criminal Case, Dkt. No. 19, p. 3].

94.     Mr. Schwartz also admitted that "he knew going in that he was going to need to access that money to keep the deals afloat." [Criminal Case, Dkt. No. 19, p. 3].   He further conceded that "from the outset" his promises to the Creditors to leave the funds they transferred for the Offerings untouched were fraudulent. [*Id*. p. 5].

95.     Mr. Schwartz also admitted that he used the Creditors' funds for his personal expenses, including the purchase of luxury watches. [*Id*. pp. 5, 9].

96.     The Creditors were induced to enter into Subscription Agreements by Mr. Schwartz and the Debtors' fraudulent statements.

97.     Upon information and belief, had the Creditors been aware that the Debtors were going to be used to perpetuate a fraud, they would not have transferred money or participated in the Offerings.

98.     As a result of Mr. Schwartz and the Debtors' fraudulent inducement, as of the date of the Fraudulent Transfers, the Creditors had non-bankruptcy claims against the Debtors, including claims for fraud, fraudulent inducement, breach of contract, recission and fraudulent misrepresentation.

### FACTUAL BACKGROUND RELATED TO THE FRAUDULENT TRANSFERS

99.     Upon information and belief, the Debtors were not, and were never, parties to any agreement with Defendant.

100.    Upon information and belief, the Debtors never received invoices from Defendant for amounts due for any services or goods provided by Defendant.

101.    Upon information and belief, the Debtors have no relationship and have never had a relationship with or to the Defendant.

102.    Upon information and belief, the Defendant had knowledge or should have known that the Debtors were not parties to any agreements with Defendant.

103.    Upon information and belief, the Defendant had knowledge or should have known that the Debtors were not obligated for any amounts due to Defendant.

104.    Based upon the Independent Manager's investigation carried out after her appointment and during the Bankruptcy Cases, the Debtors' books and records reflect that the Debtors transferred **$534,945.84** in cash, directly or indirectly, to the Defendant, which transfers are listed on **Exhibit 1** attached hereto, incorporated herein, and referred to as the "Fraudulent Transfers".

105.    The Fraudulent Transfers were made with the Debtors' funds and made by the Debtors either directly through their accounts or accounts in the name of Mr. Schwartz or related entities, in which case the transferred funds are traceable to the Debtors.

106.    At the time the Fraudulent Transfers were made, the Debtors held claims against Mr. Schwartz, Nightingale and related entities, including the entity whose name is listed on the bank account making the transfer on **Exhibit 1**.

107.    Upon information and belief, the Debtors made the Fraudulent Transfers to the Defendant to pay amounts for which the Debtors had no responsibility or obligation to pay, but which were the obligations of Mr. Schwartz and/or other non-Debtor entities.

108.    The Debtors received no benefit from making the Fraudulent Transfers.

109.    Upon information and belief, Mr. Schwartz caused the Debtors to transfer the Fraudulent Transfers to the Defendant to pay his obligations or obligations of other non-Debtor entities.

110.    As a result of the Debtors' and Mr. Schwartz's financial distress and insolvency, Mr. Schwartz routinely used whatever funds were available to pay and satisfy obligations that provided no benefit to the paying entity, and often times for Mr. Schwartz's personal expenses, as is the case with the Fraudulent Transfers made to Defendant.

111.    Upon information and belief, the Fraudulent Transfers were made when certain of the entities in the Nightingale Group were facing default on loans that financed various real estate projects and when the Nightingale entities were threatened with foreclosure in connection therewith.

112.    Upon information and belief, Defendant provided no services and the Debtors received no benefit from Defendant's services.

113.    Upon information and belief, the Fraudulent Transfers were made at the direction of Mr. Schwartz and made with the intent to hinder, delay or defraud the Debtors' creditors and investors.

114.    The Debtors knew when they solicited funds for the Offerings that their representations to potential investors regarding restrictions on the use of the funds raised through Subscription Agreements were false and that the Debtors planned to transfer those funds to Mr. Schwartz, other Schwartz-controlled entities or for the benefit of Mr. Schwartz or the Schwartz-controlled entities.

115.    The Debtors accepted Creditors' funds after representing to them that the Debtors would only use the funds as provided in the Offerings and after the Debtors had already started using Creditors' funds for purposes unrelated to the projects.

116.    The Debtors accepted Creditors' funds while knowing that they would use Creditor entrusted funds for Mr. Schwartz's personal obligations and benefit.

117.    From June 2022, and continuing on and through the dates of each of the Fraudulent Transfers and through the Petition Date, the Debtors lacked sufficient assets to either pay and/or repay all of their obligations or to fund the closing on the purchase of the Atlanta Financial Center or Lincoln Place.

118.    From June 2022, and continuing on and through the dates of each of the Fraudulent Transfers and through the Petition Date, the Debtors were insolvent.

119.    At the time the Fraudulent Transfers were made, the total value of the Debtors' assets, consisting solely of investor contributions discussed above, was less than the Debtors' debts and liabilities, which included, without limitation, liabilities arising from the failure to make required securities disclosures and damages due the investors.

120.    For ONH ACF CS, from June 2022, and continuing on and through the dates of each of the Fraudulent Transfers, ONH ACF CS was insolvent.

121.    By the end of June 2022, ONH ACF CS' liabilities exceeded its assets by at least $6 million.

122.    By the end of September 2022, ONH ACF CS' liabilities exceeded its assets by at least $18.4 million.

123.    For ONH 1601 CS, from November 2022, and continuing on and through the dates of each of the Fraudulent Transfers, ONH 1601 CS was insolved.

124.    By the end of November 2022, ONH 1601 CS' liabilities exceeded its assets by at least $467,000.

125.    By the end of January 2023, ONH 1601 CS' liabilities exceeded its assets by at least $2.9 million.

126.    The calculation of liability herein does not include, but is without prejudice to establishing, any damages or other losses on the part of investors and third parties for which the Debtors would have liability in connection with the breach of contract, fraud-related claims and securities-related claims for which liability exists.

127.    The Fraudulent Transfers were made while the Debtors were insolvent, or caused the Debtors to become insolvent, because: (i) all of the investors were creditors of the Debtors by virtue of their non-bankruptcy claims and causes of action against the Debtors, including claims for fraud, fraudulent inducement, breach of contract, rescission and fraudulent misrepresentation as of the dates of each of the Fraudulent Transfers; (ii) the Debtors had an outstanding obligation to repay the entire invested funds to investors upon failure to close the purchase of the Atlanta Financial Center and Lincoln Place; and (iii) each of the Fraudulent Transfers further depleted the investor funds that were owed to the investors, leaving the Debtors facing obligations to Creditors in excess of the funds that remained in its accounts.

21

128.    The Debtors' sole source of funds was investor funds, all of which were subject to either investment in the Atlanta Financial Center or Lincoln Place purchase or return in full. Each of the Fraudulent Transfers depleted the funds available for either completion of the proposed investments or return of the funds, and the Debtors had no alternative means to earn funds for a return to investors that would not have simultaneously increased the Debtors' liabilities.

129.    The investigation undertaken by the Trustee's professionals of the books and records of the Debtors has established that they had insufficient means to satisfy all of the Creditors' claims as a result of, and upon each of the Fraudulent Transfers as they were carried out.  As a result, the Debtors were insolvent as of the date of the first of the Fraudulent Transfers, and such insolvency increased with each further Fraudulent Transfer.

## CLAIMS FOR RELIEF

### COUNT I
**(Avoidance of Fraudulent Transfers from the Debtors to Defendant
Pursuant to 11 U.S.C. § 548(a)(1)(A))**

130.    The Trustee repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

131.    Each of the Fraudulent Transfers constitute a transfer of an interest of the Debtors in property made to or for the benefit of the Defendant.

132.    The Fraudulent Transfers were made with the knowledge that they would hinder, delay and/or defraud creditors, and thus with the actual intent to hinder, delay and/or defraud creditors.

133.    The Fraudulent Transfers were made to satisfy obligations of Mr. Schwartz, who was an insider of and controlled the Debtors, and/or other non-Debtor entities.

134.    The Debtors were insolvent at the time the Fraudulent Transfers were made or became insolvent as a result of the Fraudulent Transfers.

135.    The Fraudulent Transfers were not disclosed to third parties.

136.    The Fraudulent Transfers were made while the Debtors attempted to keep investors satisfied through overly optimistic updates sent through CrowdStreet's online platform.

137.    The Fraudulent Transfers were made to maintain other assets and to delay and hinder other creditors with partial payments on outstanding obligations to those creditors.

138.    The Debtors transferred and dissipated materially all of their funds prior to the appointment of the Independent Manager.

139.    The Fraudulent Transfers were made when the Debtors were in financial distress and the Nightingale entities were threatened with foreclosure on various loans and projects.

140.    The Fraudulent Transfers are avoidable, and the Trustee is entitled to an order and judgment against the Defendant avoiding the Fraudulent Transfers.

**WHEREFORE,** the Trustee respectfully requests this Court enter a judgment against the Defendant: (i) finding that the Fraudulent Transfers are actually fraudulent and therefore avoidable pursuant to 11 U.S.C. § 548(a)(1)(A); (ii) avoiding the Fraudulent Transfers; and (iii) granting any other and further relief as the Court determines is just and appropriate under the circumstances.

## COUNT II

### (Avoidance of Fraudulent Transfers from the Debtors to Defendant Pursuant to 11 U.S.C. § 548(a)(1)(B))

141.    The Trustee repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

142.    Each of the Fraudulent Transfers constitute a transfer of an interest of the Debtors in property made to or for the benefit of the Defendant.

23

143.    Upon information and belief, the Debtors never assumed responsibility for paying any obligations due under any agreements with Defendant and had no relationship whatsoever with the Defendant, and thus the Defendant was not a creditor of the Debtors.

144.    The Defendant did not provide goods, services, or value of any type to the Debtors in exchange for the Fraudulent Transfers.

145.    The Defendant did not provide the Debtors with reasonably equivalent value in exchange for any of the Fraudulent Transfers.

146.    The Debtors were insolvent at the time the Fraudulent Transfers were made or became insolvent as a result of the Fraudulent Transfers.

147.    At the time the Fraudulent Transfers were made, the Debtors were engaged in business or a transaction, or each was about to engage in business or a transaction, for which any property remaining constituted unreasonably small capital.

148.    The Defendant was the initial, mediate, intermediate, or subsequent transferees of the Fraudulent Transfers, or parties for the benefit of whom such Fraudulent Transfers were made.

149.    The Fraudulent Transfers are avoidable, and the Trustee is entitled to an order and judgment against the Defendant avoiding the Fraudulent Transfers.

**WHEREFORE,** the Trustee respectfully requests this Court enter a judgment against the Defendant: (i) finding that the Fraudulent Transfers are constructively fraudulent transfers and therefore avoidable pursuant to 11 U.S.C. § 548(a)(1)(B); (ii) avoiding the Fraudulent Transfers; and (iii) granting any other and further relief as the Court determines is just and appropriate under the circumstances.

## COUNT III

**(Avoidance of Fraudulent Transfers from the Debtors to Defendant
Pursuant to 11 U.S.C. § 544(b)(1) and NY Debtor Creditor
Law 270 *et. seq* (270-281-A) or Such Other Applicable State Law)**

150.    The Trustee repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

151.    Each of the Fraudulent Transfers constitute a transfer of an interest of the Debtors in property made to or for the benefit of the Defendant.

152.    The Fraudulent Transfers were made with the knowledge that they would hinder, delay and/or defraud creditors, and thus with the actual intent to hinder, delay and/or defraud creditors.

153.    Each of the Fraudulent Transfers constitute a transfer of an interest of the Debtors in property made to or for the benefit of the Defendant.

154.    The Fraudulent Transfers were made with the knowledge that they would hinder, delay and/or defraud creditors, and thus with the actual intent to hinder, delay and/or defraud creditors.

155.    The Fraudulent Transfers were made to satisfy obligations of Mr. Schwartz, an insider who controlled the Debtors, and/or other non-Debtors.

156.    The Debtors were insolvent at the time the Fraudulent Transfers were made or became insolvent as a result of the Fraudulent Transfers.

157.    The Fraudulent Transfers were not disclosed to third parties.

158.    The Fraudulent Transfers were made while the Debtors attempted to keep investors satisfied through overly optimistic updates sent through CrowdStreet's online platform, which induced investors to refrain from requesting refunds of their investments.

25

159.    The Fraudulent Transfers were made to maintain other assets and to delay and hinder other creditors with partial payments on outstanding obligations to those creditors.

160.    The Debtors transferred and dissipated all of their funds prior to the appointment of the Independent Manager.

161.    The Fraudulent Transfers were made when the Nightingale entities were threatened with foreclosure on various loans and projects.

162.    The Fraudulent Transfers are avoidable, and the Trustee is entitled to an order and judgment against the Defendant avoiding the Fraudulent Transfers.

**WHEREFORE,** the Trustee respectfully requests this Court enter a judgment against the Defendant: (i) finding that the Fraudulent Transfers are actually fraudulent transfers and therefore avoidable pursuant to state law and section 544(b)(1) of the Bankruptcy Code; (ii) avoiding the Fraudulent Transfers; and (iii) granting any other and further relief as the Court determines is just and appropriate under the circumstances.

## COUNT IV

### (Avoidance of Fraudulent Transfers from the Debtors to Defendant Pursuant to 11 U.S.C. § 544(b)(1) and NY Debtor Creditor Law 270 *et. seq* (270-281-A) or Such Other Applicable State Law)

163.    The Trustee repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

164.    Each of the Fraudulent Transfers constitute a transfer of an interest of the Debtors in property made to or for the benefit of the Defendant.

165.    The Fraudulent Transfers were made with the knowledge that they would hinder, delay and/or defraud creditors, and thus with the actual intent to hinder, delay and/or defraud creditors.

166.    Upon information and belief, the Debtors never assumed responsibility for paying any obligations due under any agreement with Defendant and had no relationship whatsoever with the Defendant, and thus the Defendant was not a creditor of the Debtors.

167.    The Defendant did not provide goods, services, or value of any type to the Debtors in exchange for the Fraudulent Transfers.

168.    The Defendant did not provide the Debtors with reasonably equivalent value in exchange for any of the Fraudulent Transfers.

169.    The Debtors were insolvent at the time the Fraudulent Transfers were made or became insolvent as a result of the Fraudulent Transfers.

170.    At the time the Fraudulent Transfers were made, the Debtors were engaged in business or a transaction, or each was about to engage in business or a transaction, for which any property remaining constituted unreasonably small capital.

171.    The Defendant was the initial, mediate, intermediate, or subsequent transferees of the Fraudulent Transfers, or parties for the benefit of whom such Fraudulent Transfers were made.

172.    The Fraudulent Transfers are avoidable, and the Trustee is entitled to an order and judgment against the Defendant avoiding the Fraudulent Transfers.

**WHEREFORE,** the Trustee respectfully requests this Court enter a judgment against the Defendant: (i) finding that the Fraudulent Transfers are constructively fraudulent transfers and therefore avoidable pursuant to state law and section 544(b)(1) of the Bankruptcy Code; (ii) avoiding the Fraudulent Transfers; and (iii) granting any other and further relief as the Court determines is just and appropriate under the circumstances.

## COUNT V

### (Recovery of Avoided Transfers
### Pursuant to 11 U.S.C. § 550(a) and Applicable State Law)

173.    The Trustee repeats and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

174.    The Trustee is entitled to avoid the Fraudulent Transfers pursuant to sections 544 and 548 of the Bankruptcy Code and applicable state law.

175.    Defendant was the initial transferee of the Fraudulent Transfers, the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Fraudulent Transfers were made.

176.    Pursuant to section 550(a) of the Bankruptcy Code and applicable state law, the Trustee is entitled to recover from Defendant an amount to be determined at trial that is no less than **$534,945.84**, plus interest thereon to the date of payment.

**WHEREFORE,** the Trustee respectfully requests this Court enter a judgment against the Defendant: (i) allowing the Trustee to avoid and recover from the Defendant the Fraudulent Transfers for the benefit of the Debtors' respective bankruptcy estates; (ii) awarding pre-judgment and post-judgment interest on any of the avoided transfers at the maximum legal rate; and (iii) granting any other and further relief as the Court determines is just and appropriate under the circumstances.

## RESERVATION OF RIGHTS

177.    The Trustee reserves the right to bring all other claims or causes of action that the Debtors may have against Defendant, on any and all grounds, as allowed under the Bankruptcy Code, or applicable law, or in equity.

178.    This Complaint is not intended to be, nor should it be construed as, a waiver of the Debtors' rights to object to any Claims or Proofs of Interest for any reason.

179.    The Trustee reserves the right to amend this Complaint as new information becomes known to the Trustee at any time during the adversary proceeding, through formal discovery or otherwise, to include such information and/or assertions with respect to the Fraudulent Transfers made to the Defendant; revise Defendant's name; add additional defendants and/or additional causes of action including, but not limited to, those pursuant to 11 U.S.C. §§ 542, 544, 547, 548 and 550, (collectively, the "Amendments"), and that any and all such Amendments relate back to the date of this Complaint.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment against Defendant:

(a) Avoiding and recovering the Fraudulent Transfers for the benefit of the Debtors' bankruptcy estates pursuant to 11 U.S.C. §§ 544, 548 and 550 of the Bankruptcy Code and applicable state law;

(a) Granting judgment in favor of the Trustee and directing Defendant to pay the Debtors' respective bankruptcy estates an amount to be determined at trial that is no less than **$534,945.84,** plus interest, pursuant to 11 U.S.C. § 550 and applicable state law;

(b) Awarding pre-judgment and post-judgment interest at the maximum legal rate; and

(c) Granting any other and further relief that is appropriate under the circumstances.

Dated: July 11, 2025
      Wilmington, Delaware                       **ARCHER & GREINER, P.C.**

By:    /s/ Natasha M. Songonuga
         Natasha M. Songonuga (Bar No. 5391)
         300 Delaware Avenue, Suite 1100
         Wilmington, Delaware 19801
         Tel: (302) 777-4350
         Email: nsongonuga@archerlaw.com

                  – and –

         **ARCHER & GREINER, P.C.**
         Gerard DiConza
         Allen G. Kadish
         1211 Avenue of the Americas
         New York, New York 10036
         Telephone: (212) 682-4940
         Email: gdiconza@archerlaw.com
                 akadish@archerlaw.com

         *Counsel for the ONH Liquidating Trust*

# **EXHIBIT 1**

**ONH AFC CS Investors LLC and ONH 1601 CS Investors LLC**
**Fraudulent Transfers: Akerman LLP**

| Debtor/Transferor | Bank | Acct # | Transfer Account Name | Date | Amount |
|---|---|---|---|---|---|
| AFC | Wells Fargo | 4872 | ONE NIGHT HOLDINGS LLC (OPERATING) | 06/07/22 | $ 4,975.00 |
| AFC | Wells Fargo | 4872 | ONE NIGHT HOLDINGS LLC (OPERATING) | 06/08/22 | $ 34,108.58 |
| AFC | CHASE | 2469 | ONE NIGHT HOLDINGS LLC | 10/26/22 | $ 34,633.49 |
| AFC | CHASE | 9584 | NITESKY MANAGEMENT LLC | 03/03/23 | $ 361,228.77 |
| AFC | CHASE | 2469 | ONE NIGHT HOLDINGS LLC | 04/05/23 | $ 100,000.00 |

|  |  |  |  |  | $ 534,945.84 |
|---|---|---|---|---|---|